## MAYOR AND CITY COUNCIL OF BALTIMORE
### ET AL. *v.* CRANE ET AL.

[No. 131, September Term, 1975.]

*Decided March 3, 1976.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE and O'DONNELL, JJ.

*James E. Carbine* and *William W. Cahill, Jr.*, with whom were *Richard S. Sokolov* and *Weinberg & Green* on the brief, for appellants.

*M. Albert Figinski* and *Joseph S. Kaufman*, with whom were *Melnicove, Greenbery, Kaufman & Weiner, P.A.* on the brief, for appellees.

SINGLEY, J., delivered the opinion of the Court.

Two of the concepts frequently encountered in the law of zoning, "vested rights"[1] and "contract zoning,"[2] have acquired a contentious gloss. While both were referred to in the briefs and argument in this case, we are satisfied that neither concept is applicable here, at least not in the strict sense in which they are used in the cases.

In 1964, the appellees, Leon A. Crane and Charles Crane (the Cranes) held title, in the name of Grindon Realty, Inc.,[3] to an 11.1937-acre tract in the northeastern suburbs of Baltimore which had been acquired in 1952. Approximately 4.6 acres of the tract lay in the way of a proposed extension of Perring Parkway from Northern Parkway to Belvedere Avenue, and negotiations had been under way for a year or more looking toward the acquisition of the 4.6-acre parcel by the Mayor and City Council of Baltimore (the City). The City

---

1. *See* Steuart Petroleum Co. v. Board of County Commr's, 276 Md. 435, 347 A. 2d 854 (1975).

2. *See* Montgomery County v. National Capital Realty Corp., 267 Md. 364, 373-74, 297 A. 2d 675, 680-81 (1972); Carole Highlands Citizens Ass'n v. Prince George's County, 222 Md. 44, 47-48, 158 A. 2d 663, 665 (1960).

3. The Cranes took legal title to the remaining property upon dissolution of Grindon Realty, Inc. in March of 1973. Throughout this opinion, we have treated the Cranes as the legal owners.

arranged for an appraisal of the parcel, and its expert concluded that since the Cranes contemplated improving the entire tract with 180 apartment units, the taking of the 4.6-acre parcel, and the consequent reduction in permissible density (16 units per acre), would reduce the value of the Cranes' holding from $181,341.00 before the taking to $112,000.00 after the taking, a difference of approximately $70,000.00.

At this point, an accommodation was worked out. Ordinance No. 148 was introduced in the City Council and was enacted on 24 March 1964, having been approved by the City's Planning Commission on 4 February 1964, specifically as it related to the Cranes' proposed development. In pertinent part, the ordinance provided:

"In determining the number of families which may be housed on a lot or tract of land under subsection A of Section 25 and in determining whether or not a tract of land contains five acres under subsection N. of said Section 25, the area of land designated on an approved subdivision plat or builders' location plat, certified by the Planning Commission as essential to over-all community planning and not for the sole benefit of any one individual, and that the judgment of the Planning Commission with respect to what is essential to over-all community planning should be limited to what might be called major streets, arterial streets and expressways, as shown on the adopted master plans, and thereby or thereafter given or dedicated to the Mayor and City Council of Baltimore by the owner, at the request of the Planning Commission, for the purpose of establishing, extending or widening a street or alley abutting the lot or tract involved, shall be included in the area of such lot or tract of land, and that if buildings have frontage on the new highway, then the Planning Commission can limit the density allowance to the incremental width beyond the right-of-way normally required

by the subdivision regulations, and further providing that the Planning Commission may limit the application of [this] Paragraph 31 L if, in the Planning Commission judgment, the absence of a limitation would permit a development of undesirable density or a development which would not be compatible with existing or anticipated future development in adjacent areas."

The practical effect of the enactment of the ordinance was to give the Cranes, upon their conveyance of the 4.6-acre parcel to the City without receiving any consideration therefor, provided that the Planning Commission approved, the right to develop the remaining 6.5 acres to the same density (180 units) as would have been permissible prior to the conveyance on the entire 11.1937-acre tract.

After the enactment of the ordinance, the Planning Commission, on 21 April 1964, gave final approval to a subdivision and development plan submitted by the Cranes, contemplating the construction of 180 garden-type units, and the City's Zoning Commissioner certified that his approval would be forthcoming upon the filing of an appropriate application.

Thereafter, the Cranes conveyed the 4.6-acre parcel to the City for a nominal consideration of $1.00 and also granted certain additional utility easements and rights of way to the City, and about one-fourth of an acre to the City's Board of Education for an aggregate consideration of about $7,500.00. There matters stood until 20 April 1971, when the City enacted a new comprehensive zoning ordinance.

While the zoning ordinance was pending, Mr. Leon A. Crane became concerned about its possible application to the property, and he and his counsel discussed the problem with various city officials. On 28 October 1970, Simon Schonfield, Esq., an Assistant City Solicitor, categorically assured the Cranes' counsel that "there is no change in the new zoning ordinance which would affect ... [the Cranes'] rights as originally agreed upon ... [with] the Mayor and City Council of Baltimore. . . ."

On 6 March 1972, Mr. Schonfield submitted a formal opinion in response to a request from the City's Commissioner of Housing and Community Development. After reviewing the factual background, the opinion concluded:

"It is quite evident that the City in accepting the five acres, made itself legally bound to allow the owner of the property to construct the number of dwelling units in accordance with the terms expressed by the provisions of Ordinance No. 148. To allow the City the right to change the density requirements that it had previously approved by an amended zoning ordinance would be unfair and inequitable, as the City is now enjoying the benefits of the transfer of five acres of land. Ordinance 148 was pending before the City Council for one year prior to its adoption on March 25, 1964, and it appears that the City had full opportunity to consider its impact on the community and general public."

\* \* \*

"In view of the above, it is our opinion that the approval of the Planning Commission and the Department of Public Works to allow the Grindon Realty Company to construct 180 dwelling apartments in compliance with the provisions of Ordinance 148 constitutes a valid and enforceable legal agreement, and it therefore follows that the Grindon Realty Company should be permitted to construct its proposed building project of 180 dwelling units."

In 1973, the Cranes joined with Mr. Howard Brown in an informal partnership looking toward the development of the property. A preliminary development plan for the erection of two midrise buildings containing 178 units (rather than the 180 garden-type apartment units projected in 1964) was submitted to the City's Planning Commission, which on 25 June 1973, questioned the appropri-

ateness of the scale and density of the project, but recognized the Cranes' right to construct 178 units.

Less than three weeks later, the Planning Commission disapproved the preliminary plans primarily because "multiple dwelling development of 100 or more apartment units is [a] conditional use which must be approved by the Mayor and City Council" (under the new zoning ordinance) and ended with the ominous note that:

> "As part of the vote to reject the preliminary development plan for the Perring Apartments, the Commissioners also recommended that the City make an effort to negotiate acquisition of this property to become open land or parkland."

In August, 1973, the Cranes instituted suit in the Superior Court of Baltimore City against the City, the City's Board of Estimates and the City's Planning Commission (hereafter referred to collectively as "the City") seeking declaratory relief, a writ of mandamus and damages. The defendants filed an answer to the declaratory action, a demurrer to the mandamus suit, and a general issue plea to the action in damages. The case came on for trial before Liss, J. without a jury. From an order of the Superior Court granting declaratory relief,[4] the defendants appealed to the Court of Special Appeals. We granted certiorari before the matter came on for hearing in that Court.

The City advances a four-pronged argument:

(i) The Cranes cannot require the City to disregard the provisions of the 1971 zoning ordinance, by which it is legally bound;

(ii) The 1964 transactions cannot be viewed as creating "contract" rights;

(iii) Any rights which the Cranes might have had to construct a complex with 180 units were extinguished due to their failure to

---

**4.** The mandamus action was voluntarily dismissed by the plaintiffs. In view of the result, the trial court did not reach the question of damages but retained jurisdiction over this count.

undertake any construction or improvements under the approved plan for a period of almost eight years following tentative approval; and

(iv) The March 6, 1972 City Solicitor's opinion has no binding or precedential effect on either this Court or the City.

Early on, we noted that, in our opinion, this case involves neither a vested right nor contract or conditional zoning, as those terms are generally used in zoning cases. The trial court took essentially the same position in this regard. What was involved was a City ordinance, neither enacted for the benefit of the Cranes, nor especially tailored to their needs, but presenting an open-ended offer to any developer who would give a portion of his tract "for the purpose of establishing, extending or widening a street or alley abutting the lot or tract involved," to have the land contributed added, for the purpose of density restrictions, to the tract retained, provided the developer obtained the concurrence of the Planning Commission.[5] The Cranes accepted the offer, conveyed the 4.6-acre parcel, and received Planning Commission approval for the construction of 180 units on the remaining 6.5 acres.

We have, on numerous occasions, dealt with attempts at contract zoning, and have repeatedly explained why such zoning is not permitted. For example, in *Wakefield v. Kraft*, 202 Md. 136, 143, 96 A. 2d 27, 29-30 (1953), Judge Hammond, for the Court, stated:

". . . [W]hen a legislative body in this collective, communal lawmaking restricts the use of property, those restricted are entitled to the reliance that all others similarly situated will be similarly restricted. A rezoning ordinance may not do violence to this principle. . . . Such an ordinance must not amount to the granting of a special privilege."

---

5. There is a suggestion in the record that at least one other developer availed himself of the provisions of the ordinance.

*See also Montgomery County v. National Capital Realty Corp.*, 267 Md. 364, 297 A. 2d 675 (1972); *Baylis v. City of Baltimore*, 219 Md. 164, 148 A. 2d 429 (1959). Thus, had the City agreed to allow the Cranes to include the 4.6-acre tract in their density computation, without enacting an ordinance granting this benefit to all similarly situated property owners, the arrangement would have amounted to contract zoning. Because the ordinance was made applicable to anyone willing to dedicate or give land to the City for the purpose of highway construction, extension or widening, we are convinced that this cannot be equated with contract zoning.

Conversely, the Cranes argue that once they had accepted the City's offer and actually conveyed the 4.6-acre tract to the City, receiving in return Planning Commission approval for the construction of 180 units on the remaining 6.5 acres, they acquired a "vested right" to build the 180 units. We are of the opinion that this is a misconception. In *Steuart Petroleum v. Board of County Comm'rs*, 276 Md. 435, 347 A. 2d 854 (1975), we reviewed the cases in the area. Normally, a property owner acquires no vested right to build in reliance on an existing zoning classification or under an outstanding permit unless he has materially altered his position, usually by the commencement of construction, before the zoning classification is changed or the permit revoked. The property owner may not even rely on estoppel if construction is commenced in reliance on an illegally issued permit, *Lipsitz v. Parr*, 164 Md. 222, 164 A. 743 (1933), or on official assurances given by officials who exceed their authority, *City of Hagerstown v. Long Meadow Shopping Center*, 264 Md. 481, 494-95, 287 A. 2d 242, 248-49 (1972).

In this case, while the Cranes acquired no vested right, in the usual sense, we are prepared to hold that they acquired a vested contractual interest, which was derived from their acceptance of the offer contained in Ordinance No. 148 and their compliance with its terms.

What we must decide, therefore, having concluded that neither the concept of contract zoning nor vested rights is here applicable, is whether the Cranes may, nevertheless, be

permitted to construct an apartment complex containing more than 100 units on the 6.5-acre parcel. We now turn to a consideration of the four reasons advanced by the City in support of its contention that the question should be answered in the negative.

(i)

Is the City bound by the 1971 comprehensive rezoning?

We think that the City is estopped from attempting to enforce the 1971 zoning ordinance in this instance because of the Cranes' substantial change in position. There is no question that the doctrine of equitable estoppel may be asserted against a municipal corporation in circumstances like those here, *Prince George's County v. McBride*, 268 Md. 522, 534-35, 302 A. 2d 620, 626 (1973); *Rockville Fuel & Feed Co. v. Gaithersburg*, 266 Md. 117, 134-35, 291 A. 2d 672, 680-81 (1972); *City of Baltimore v. Chesapeake Marine Ry. Co.*, 233 Md. 559, 578, 197 A. 2d 821, 830 (1964); *Hagerstown v. Hagerstown Ry. Co.*, 123 Md. 183, 91 A. 170 (1914). It is the last of these cases which is particularly persuasive here. There, the City of Hagerstown, by ordinance, permitted the individual who owned an electric plant to install poles and string wires on the city streets, a right later assigned to the Railway Company. When the City determined to construct a municipal electric plant, it attempted to revoke the franchise. Our predecessors held that the City was estopped from taking this action. Indeed, where a municipal corporation has made an offer by ordinance which has been accepted and acted upon by another, a contract may arise, the obligation of which is constitutionally protected against impairment, 5 E. McQuillin, Municipal Corporations § 19.39, at 499 (1969); 16 Am. Jur. 2d *Constitutional Law* §§ 422-23, at 762-64 (1964). Further, the vested contractual interest acquired under a statute or ordinance may in some circumstances survive the repeal of the statute or ordinance, *Causey v. Gray*, 250 Md. 380, 387, 243 A. 2d 575, 581 (1968); *McMechen v. City of Baltimore*, 2 H. & J. 41 (1803).

(ii)

Did the 1964 transactions create contract rights?

In *Funger v. Mayor of Somerset*, 249 Md. 311, 239 A. 2d 748 (1968) and *Greenbelt v. Bresler*, 248 Md. 210, 236 A. 2d 1 (1967), we concluded that an agreement under which a developer makes certain concessions to a town or village in consideration of an undertaking by the town or village to support a requested change in a zoning classification did not constitute impermissible contract or conditional zoning because it was the county, and not the town or village, which had the power to zone or rezone.

We are prepared to adopt a similar principle as being applicable here. It should be emphasized that the conveyance of a part of the Cranes' tract was not made to the City as a result of a private bargain struck between the City and the Cranes. Ordinance No. 148 was originated by the City and the Planning Commission to facilitate the construction of highways in developing areas. It proposed a mechanism available to any property owner who was willing to contribute a right of way. This cannot be equated with a situation where there is a change in the zoning classification of a particular property or the granting of a special exception to a particular owner conditioned upon some undertaking given by that owner to the legislative body, as was the case in *Montgomery County v. National Capital Realty Corp.*, 267 Md. 364, 373-75, 297 A. 2d 675, 680-81 (1972).

The Cranes rely on *Ward v. City of New Rochelle*, 20 Misc. 2d 122, 197 N.Y.S.2d 64 (Sup. Ct.), *aff'd without opinion*, 9 App. Div. 2d 911, 197 N.Y.S.2d 128 (App. Div. 1959), *aff'd without opinion*, 8 N.Y.2d 895, 204 N.Y.S.2d 144, 168 N.E.2d 821 (1960). There, Mrs. Ward was the owner of a 62.2-acre tract, which had recently been placed in an R-1A District (individual residence on lots containing 10,000 square feet). The New Rochelle City School District requested Mrs. Ward to contribute a 13.3-acre parcel, for the construction of an elementary

school and recreational facilities. Mrs. Ward agreed, if the 13.3-acre parcel, worth $140,000.00, were taken into account in permitting Mrs. Ward to divide her remaining land into lots, a proposal which was approved by the City Planning Board on 10 December 1956. Mrs. Ward made the necessary conveyances in December, 1956 and January, 1957. Six days after the last conveyance, the Planning Board disapproved the subdivision plan, and recommended that the property be put in a classification requiring 20,000 square foot lots.

Mrs. Ward brought an action for a declaration of her rights. In the course of an opinion upholding Mrs. Ward's contention that she should be permitted to develop her land in accordance with the subdivision plan submitted, the referee noted:

> "Vested rights are variously defined in various cases, and no case has been found which is the parallel of this case. Most cases of vested rights grow out of circumstances in which a permit has been issued by some municipal official with authority, and pursuant to that permit, the permittee proceeds with his improvements, spends money to further it, and obligates himself in reference to it. It should be pointed out that if, in such cases, a vested right comes into being, although such expenditures are expected to be recouped by the sale of lots, how much more readily should a vested right come into being in a case such as this, where the permittee has actually permanently parted with land of great value for the benefit of the School District and the City, as well, with no chance of recoupment, as in the case of the usual permittee, who claims a vested right." 20 Misc. 2d at 128, 197 N.Y.S.2d at 70-71.

The City would have us distinguish this case, largely on the ground that the result was reached on equitable considerations. We perceive no real difference between the Cranes' situation and Mrs. Ward's.

### (iii)
### Were the Cranes' rights extinguished by their delay?

This case should not be confused with those in which a property owner contends that he has a vested right in an existing zoning classification or under an existing building permit, exemplified by *Steuart Petroleum Co. v. Board of County Commr's*, 276 Md. 435, 347 A. 2d 854 (1975); *County Council v. District Land*, 274 Md. 691, 337 A. 2d 712 (1975); *Rockville Fuel & Feed Co. v. City of Gaithersburg*, 266 Md. 117, 291 A. 2d 672 (1972) and *Ross v. Montgomery County*, 252 Md. 497, 250 A. 2d 635 (1969).

The Cranes' rights were contractual and became vested by their conveyance as solidly as if they had entered into a contract with the City to sell the 4.6-acre parcel for $70,000.00. It is the law of this State that a municipality, acting through its duly-elected or appointed officials, becomes bound by its agreements so long as those agreements are for the public good, *Williamsport v. Washington County Sanitary Dist.*, 247 Md. 326, 332, 231 A. 2d 40, 44 (1967); *City of Rockville v. Brookeville Turnpike Const. Co.*, 246 Md. 117, 129, 228 A. 2d 263, 270 (1967).

While they may not have acquired a right in perpetuity, they certainly had a right the life of which was only limited by reasonableness, 3 E. Yokley, Municipal Corporations § 436, at 8 (1958), a right which was neither extinguished nor attenuated by a lapse of nine years, primarily because from 1964 until at least 1971, the Cranes had no reason to suppose that their right was at hazard.

### (iv)
### Does the City Solicitor's opinion have a binding or precedential effect?

The City contends that it does not, an argument which the Cranes do not controvert. The City argues that the City Solicitor is given no power to bind the City under Baltimore City Charter (1964) Art. VII, § 27, and this would seem to conform to the general rule that a city attorney has no greater power to bind the municipality than a private

attorney has to bind his client, *Gontrum v. City of Baltimore*, 182 Md. 370, 374, 35 A. 2d 128, 130 (1943); 3 E. McQuillin, Municipal Corporations § 12.52, at 234 (3d ed. rev. 1973). This does not mean, however, that a contemporaneous construction made by a city law officer is not entitled to some weight, *Liss v. Goodman*, 224 Md. 173, 179, 167 A. 2d 123, 126 (1960).

One final aspect of the case remains, which we propose to consider despite the fact that it was not disposed of below, in order to avoid the expense and delay of another appeal, as permitted by Maryland Rule 885.

In its opinion, the trial court carefully skirted the question whether the Cranes would be confined to the plan of development for which they were given approval in 1964, which proposed garden-type units, or whether the only limitation to which they were subject was that regarding density, with the consequence that they were entitled to seek approval of two midrise buildings, containing 178 units.

The first paragraph of the declaratory judgment said:

> "ADJUDGED, DECLARED, ORDERED AND DECREED, that, for the reasons set forth in the Court's Oral Opinion, the Plaintiffs have a vested right to construct 180 apartment units on the tract of land comprising 6.5 acres fronting on Perring Parkway which tract of land is more particularly described in Plaintiffs' Suit for Declaratory Judgment."

Because we believe, under the facts of this case, that the Cranes are generally confined to a development of the sort which was contemplated in the plan of development approved in 1964, we propose to modify the judgment by adding to the above quoted paragraph a final sentence:

> "The construction of such units shall be, to the extent practicable, in the manner proposed in the preliminary plan of development approved by the Planning Commission on 21 April 1964."

*Declaratory judgment modified, and as modified, affirmed; costs to be paid by appellants.*